## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**DENNIS M BURKHARTSMEIER** and<br>**BRENDA P BURKHARTSMEIER**,<br><br>Debtors. | Case No.  **11-61667-13** |
| **ERNIE GARCIA**,<br><br>Plaintiff.<br><br>-vs-<br><br>**BRENDA BURKHARTSMEIER** and<br>**DENNIS M. BURKHARTSMEIER**,<br><br>Defendants. | Adv No.  **11-00069** |

## MEMORANDUM of DECISION

At Butte in said District this 24th day of October, 2012.

In this Adversary Proceeding, after due notice, trial was held July 25 and 26, 2012, in Billings.  Plaintiff Ernie Garcia ("Ernie") was represented at trial by Martin Smith and Burt Hurwitz of Billings, Montana; Defendants Brenda P. Burkhartsmeier ("Brenda") and Dennis M. Burkhartsmeier ("Dennis") were represented at trial by Gary S. Deschenes of Great Falls, Montana.  Ernie, Brenda and Dennis testified.  Ernie's Exhibits 1 through 27, 30, 31, 34 through 39, 45, 47, 49, 65, 66, 69 and 70 were admitted into evidence, as were Defendants' Exhibits 1, 2, 3, 4 and A.  At the conclusion of the trial, the Court took the matter under advisement and

1

granted the parties time to file post-trial briefs.  The time for filing briefs has expired and the matter is ready for decision.  This Memorandum of Decision includes the Court's findings of fact and conclusions of law.

Prior to commencement of trial, the Court entered an Order on July 24, 2012, approving the parties' Pre-Trial Order filed that same date.  In the Pre-Trial Order, the parties identified as a legal question, to be determined in advance of trial, whether the Court would take judicial notice of the orders, judgments and findings entered by Judge Susan P. Watters, Montana Thirteenth Judicial District Court, in *Vlahakis v. Burkhartsmeier*, Cause No. DV 07- 623 and by Judge Russell Fagg, Montana Thirteenth Judicial District Court, in *Garcia v. Mountain Manufacturing, Inc.*, et al, Cause No. DV 07-0506.  To the extent permitted under the Federal Rules of Evidence, the Court granted the request for judicial notice.

At trial, the Court clarified that the aforementioned orders, judgments and findings, which perhaps support a claim under 11 U.S.C. § 548, did not establish the elements of fraud under 11 U.S.C. § 523(a)(2)(A).  As the Court explained, those prior orders, judgments and findings pierced Mountain Manufacturing, Inc.'s corporate veil as to Brenda because Brenda sold Mountain Manufacturing, Inc.'s assets and then manipulated the sales proceeds with the intent to commit a fraud upon creditors of Mountain Manufacturing, Inc.  Specifically, Judge Watters pierced the corporate veil because Brenda was in control of Mountain Manufacturing, Inc. as its officer and employee, was its sole shareholder, directed its activities, used the sale of assets to Partnered Beverages, LLC as a scheme and device to avoid paying the creditors of Mountain Manufacturing, Inc., used the corporation's credit to acquire a cabin in Cooke City, which was then transferred to Brenda, caused corporate profits and earnings to be distributed other than

2

through dividends, left the corporation undercapitalized and unable to pay its creditors, and generally defrauded the creditors.  As a result of the foregoing, Judge Susan P. Watters concluded Brenda intended to hinder, delay, or defraud creditors by entering into a certain Assumption and Satisfaction Agreement dated October 27, 2006.  Judge Susan P. Watters thus held that the Assumption and Satisfaction Agreement was a voidable fraudulent transfer.

Judge Fagg subsequently determined on April 26, 2011, that the fraudulent transfer referenced in Judge Susan P. Watters' order was a fraudulent transfer as to all creditors.  Ernie was a creditor and thus, Judge Fagg concluded Ernie was defrauded by Brenda.  Judge Fagg entered judgment against Mountain Manufacturing, Inc., Mountain Mudd, LLC, The Coffee Cooperative, Inc., ABC Coffee, LLC and Brenda in favor of Ernie in the amount of $194,322.06. Based upon the foregoing judgment, Ernie filed Proof of Claim No. 5 on October 12, 2011, asserting a secured claim of $200,923.69.  On November 7, 2011, the Court entered an Order avoiding Ernie's judicial lien against Debtors' residence in Billings, Montana.  Ernie commenced this Adversary Proceeding on December 19, 2011.  In an Amended Complaint filed March 20, 2012, at docket entry no. 14, Ernie seeks to except $194,322.06 from Dennis and Brenda's discharge under 11 U.S.C. § 523(a)(2).

## FACTS

In 1994, Brenda and her sister-in-law, Louise, started a drive-through coffee business known as Mountain Mudd coffee.  As part of the coffee business, Brenda and Louise formed Mountain Mudd, LLC ("Mountain Mudd"), in which each owned a 50 percent interest.  Brenda and Louise started their coffee business with one kiosk in Billings, but were soon operating 15 coffee kiosks in the Billings area.

3

Brenda also started helping other people start coffee kiosk businesses, and formed Coffee Cooperative, Inc. to assist with such endeavor. Brenda originally intended that Coffee Cooperative, Inc. would distribute products to coffee kiosks. Brenda believes she was the owner of Coffee Cooperative, Inc. Brenda was unsure of the difference between Coffee Cooperative, Inc. and Coffee Cooperative Association. The evidence shows that Coffee Cooperative, Inc. was incorporated on October 22, 2002, and was involuntarily dissolved on December 2, 2003. Coffee Cooperative Association was incorporated on January 28, 2004, and was involuntarily dissolved on December 1, 2005.

As part of her growing coffee business, Brenda also formed Mountain Manufacturing, Inc. ("Mountain Manufacturing") to construct coffee kiosks. Mountain Manufacturing was incorporated in March of 1999. As later explained in a Mountain Manufacturing Quality Control Manual:

> Mountain Manufacturing is a national company located in Billings, Montana.
>
> * * *
>
> Our standard 8'X8' building is an 1/8" steel framed, self contained structure. We call it a ***kiosk***. This is a German word meaning "turnkey". Our buildings are placed with the Mountain Mudd name or by our customers that want to start their own drive-through Espresso business under their own name. We supply them with the building, consulting, and equipment. Our local and national success has been replication. Our customers are investing into their own business in their own communities.

That same Quality Control Manual includes an organizational chart for Mountain Manufacturing, which identifies Brenda as its President and Dennis as the person in charge of design and engineering. The Quality Control Manual also explains that the President is "[i]nvolved in all aspects of decision making and oversees the entire operation of company," while Dennis, as the

4

person responsible for design and engineering, is "[r]esponsible for overseeing all aspects of production and product quality.  Makes daily inspections of the facilities and work in progress to ensure that production personnel and subcontractors are following the process procedures and application fabrication drawings.  The final accountability for quality assurance and production rests upon this person."  Finally, in a document titled "Production Staff Resumes" attached to the Quality Control Manual,  Dennis is described as the "Co-Owner of Mountain Manufacturing, Dennis designed the original building.  Responsible for design control and overseeing all divisions of manufacturing, including training and has the authority to identify and evaluate quality problems.  Oversees inspections and methods for corrective actions."

As the coffee business grew, Louise no longer wanted to be involved.  By 2004, Brenda had agreed to purchase Louise's interest in Mountain Mudd.  From at least 2004, Brenda was Mountain Mudd's sole member.  However, Brenda did not complete her purchase of Louise's interest in Mountain Mudd until Mountain Mudd and Mountain Manufacturing were purchased, at least in part, by a third party in 2006.

Brenda formed Seaside Properties, LLC ("Seaside Properties") when she decided to centralize the various coffee operations in a downtown Billings location.  Seaside Properties originally purchased a building at 2923 Montana Avenue in Billings but sometime in 2004 or 2005, through a 1031 exchange, acquired a new business location at 2120 3rd Avenue North in Billings.  Seaside Properties was owned jointly by Brenda and Dennis.

On or about October 23, 2006, Brenda, on behalf of Partnered Beverages, LLC ("Partnered Beverages"); ABC Coffee, LLC ("ABC Coffee"), formerly known as Mountain Mudd; Mountain Manufacturing; and Seaside Properties executed an Agreement of Purchase and

5

Sale of Assets whereby ABC Coffee, Mountain Manufacturing and Seaside Properties agreed to sell, transfer, assign and convey to Partnered Beverages: (1) all real estate owned by ABC Coffee, Mountain Manufacturing and Seaside Properties; (2) all the buildings, fixtures and other real property improvements owned by ABC Coffee, Mountain Manufacturing and Seaside Properties; (3) all personal property including but not limited to, all ABC Coffee, Mountain Manufacturing and Seaside Properties' right, title and interest in inventories of merchantable and non-obsolete merchandise; (4) to the extent assignable, all ABC Coffee, Mountain Manufacturing and Seaside Properties' rights and obligations in leases; (5) to the extent assignable, all "rights and obligations in contracts, if any, that are: (i) specifically associated with the Business on the Closing Date, all of which are more particularly described on Exhibit 'C';"[1] (5) any and all accounts, notes and/or other form of receivable owed to ABC Coffee, Mountain Manufacturing and Seaside Properties; (6) all documentary business records; and (7) all ABC Coffee, Mountain Manufacturing and Seaside Properties' rights, title and interest in goodwill and intellectual property rights owned by ABC Coffee, Mountain Manufacturing and Seaside Properties.  Consummation of the purchase and sale of assets was to occur on or before November 1, 2006.

Per the Purchase and Sale Agreement, cash proceeds from the sale were to be allocated $500,000 to ABC Coffee, $1,400,000 to Seaside Properties with the balance allocated to Mountain Manufacturing.  The parties to the Purchase and Sale Agreement estimated that a "Customer Contract Prepaid Balance" of $566,000 would exist on the closing date and that the

---

[1] Exhibit C to the Purchase and Sale Agreement did not identify a contract with Ernie, but it did identify "Territory Agreements" for various locations, including "Mesa, Chandler & Gilbert, AZ[.]"

Net Purchase Price would be adjusted for any variance in the Customer Contract Prepaid Balance on the closing date.

After the sale of assets closed, as contemplated in the Purchase and Sale Agreement, Brenda served as President of Partnered Beverages for approximately one year.  Gary Broughton took over as President thereafter.

On October 27, 2006, Brenda, as President of the assignor Mountain Manufacturing, and individually as assignee, executed an Assumption and Satisfaction Agreement.  Pursuant to the Assumption and Satisfaction Agreement, Brenda specifically did not assume "any liability whatsoever for . . . [c]laims asserted by any prospective kiosk buyer not expressly identified above.  Prospective buyers excluded from this assumption agreement shall include but not be limited to: . . . Ernie Garcia[.]"

As previously mentioned, in an action initiated by Lana Vlahakis and Brenda Hyde, Judge Watters concluded the Assumption and Satisfaction Agreement was a fraudulent transfer.  Judge Fagg subsequently determined that the fraudulent transfer referenced in Judge Watters' order was a fraudulent transfer as to all creditors, and voided the Assumption and Satisfaction as to all creditors, including Ernie.

In connection with the Purchase and Sale Agreement, Brenda sent a letter to "Co-op Member[s]" dated November 17, 2006, announcing that Mountain Mudd, Mountain Manufacturing and Coffee Cooperative had joined forces with CHS, Inc. "to create a joint venture named Partnered Beverages, LLC."  The letter stated that "Partnered Beverages assumed all of Mountain Mudd's obligations to its Members under the Membership Agreements."

In 2001, prior to the Purchase and Sale Agreement and the Assumption and Satisfaction

Agreement, Mountain Mudd and Mountain Manufacturing applied for permits to operate two coffee kiosks in Maricopa County, Arizona on behalf of Espresso to Go.  On or about October 17, 2011, the applications were denied because Mountain Mudd's kiosk concept did no comply with certain "Mobile Food Unit" guidelines.  The Notification of Plan Disapproval states that "[e]tablishment must either by connected to City of Phoenix water and sewer, or, have an approved well and septic system."  The Notification also advises: "Restrooms were not shown on plans.  Toilet facilities that meet all Health Code standards and are readily accessible must be located within 200 feet of the food preparation and/or utensil washing areas."  For reasons not stated, Mountain Mudd abandoned the application process in Maricopa County at that time.

Plaintiff Ernie Garcia grew up in Arizona, but moved to Billings in the late 1980's.  Ernie frequented the Mountain Mudd coffee kiosks in Billings and in late January or early February 2004, decided to visit Mountain Mudd's corporate headquarters to see about the possibility of opening a Mountain Mudd coffee kiosk in Arizona.  During that initial visit, an employee of either Mountain Mudd or Mountain Manufacturing provided Ernie with Mountain Mudd/Mountain Manufacturing's pro forma information.

Shortly after his initial visit, Ernie met Brenda and Dennis in early February 2004.  During this first meeting, which lasted approximately one and one-half hours, Ernie, Brenda and Dennis discussed business opportunities available with Mountain Mudd coffee.  Ernie remembered discussing the "turnkey" nature of Mountain Mudd's business model.  Ernie also recalled touring Mountain Manufacturing's facilities with Dennis and specifically recalled seeing finished kiosks that had signs identifying the final destination for the completed  kiosks.  For instance, at least one finished kiosk that Ernie saw was destined for Colorado.  Ernie learned

8

early on from Brenda and Dennis, who presented themselves as a business team, that Brenda took care of the administrative and sales end of the business while Dennis was in charge of manufacturing and facilities.  In a nut shell, Brenda and Dennis were selling knowledge, service, and a turnkey kiosk.

When Ernie expressed interest in opening a Mountain Mudd kiosk in Arizona, Brenda told Ernie that it would be no problem and in fact, Mountain Mudd already had two potential locations identified in Mesa, Arizona.[2]  Brenda and Dennis told Ernie they could get started on the permitting process as soon as Ernie signed a standard purchase agreement and paid 50 percent of the purchase price of each kiosk.  Brenda acknowledged that it was her responsibility to secure the necessary permitting for clients who had entered into purchase agreements with Mountain Manufacturing.

Ernie was advised that once his necessary permits were secured, Mountain Mudd and Mountain Manufacturing would request the balance of the purchase price for the kiosks.  Once the final installments were paid, Mountain Manufacturing would build Ernie's kiosks.

Ernie agreed to move forward with the two locations previously selected by Mountain Mudd.  Brenda and Dennis told Ernie it would take six to twelve months to complete the permitting process and get Ernie's kiosks up and running in Arizona.

 On March 8, 2004, Ernie and Mountain Manufacturing executed a Purchase Agreement and Bill of Sale for Kiosk #1, Serial #MM880011002043004.  Ernie paid $36,750.00 toward Kiosk #1.  On that same date, Ernie and Mountain Manufacturing executed a Purchase

---

[2]  Mountain Mudd had also gone through the process for another individual or entity to open a kiosk in Prescott, Arizona.  The kiosk in Prescott, Arizona is connected to city sewer and water.

Agreement and Bill of Sale for Kiosk #2, Serial #MM880011002043005.  Ernie paid $36,750.00 as a down payment on Kiosk #2.  The initial payments for Kiosk #1 and Kiosk #2 totaling $73.500.00 were made with a cashier's check from First Interstate Bank dated February 20, 2004.

The two Purchase Agreements provide in paragraph 1: "Only if permits are absolutely unobtainable in any way for reasons passed through the city/state/county, which is not limited to applying as a permanent structure, hard plumbing, or complying with required modifications or customizations to equipment and installation, said deposit is refundable, with the exception of up to $5,000.00 due to costs incurred by Mountain Manufacturing for permitting and site locating." Ernie testified that it was his understanding that if Mountain Mudd was unable to secure the necessary permits, he would get all his money back, save $5,000.00 per kiosk.

According to the attachments to the Purchase Agreements, Ernie was to receive a "self-contained ready to go, standard on the ground kiosk."  Ernie likened Mountain Mudd's coffee kiosks to  travel trailers.  Ernie explained that the kiosks he was shown had their own self-contained water system.[3]  Ernie testified that the self-contained nature of the kiosks was a critical feature because Ernie did not want to incur any additional expense for installing water and sewer for a mobile kiosk.

In February of 2004, Ernie also entered into a "Coffee Cooperative, Inc. Membership

_____

[3] Attachment A to the Purchase Agreements, which is incorporated under paragraph 1 of the Purchase Agreements, describes the standard specifications of a Kiosk Model 88, which includes a self-contained water system comprised of a 38-gallon grey water polyethylene tank, 32-gallon fresh water polyethylene tank, exterior locking water fill door, fully automatic water pump and filtration system, hot water heater, enclosed insulated water pipes and re-circulating water system and water pipe freeze protection.

Agreement."[4]  The Territory Agreement dated March 2, 2004, attached to the Membership

Agreement identified Ernie's territory as the "cities of Mesa, Chandler and Gilbert in the County

of Maricopa, and Apache Junction in the County of Pinal all in the State of Arizona."  The

Territory Agreement also gave Ernie the first right of refusal with respect to "the cities of Sedona

and Casa Grande, in Yavapai and Pinal Counties, respectively."

　　　　After Ernie signed the Purchase Agreements and paid $73,500, a friendship developed

between Ernie, Brenda and Dennis.  Ernie would often stop by Mountain Mudd and Mountain

Manufacturing's headquarters to visit with Brenda and Dennis.  The relationship grew to the

point where the three would have dinner together and Ernie recalled staying with Brenda and

Dennis on at least one occasion at their cabin in Cooke City.

　　　　After a few months had passed and notwithstanding his new friendship with Brenda and

Dennis, Ernie began to express concern that Mountain Mudd had not yet secured his permits in

Arizona.  Ernie had planned a trip to Arizona and in June or July of 2004, Ernie asked Brenda for

the addresses of the two locations so he could visit the sites.  At that time, either Brenda or

someone else from Mountain Mudd told Ernie that the process for the original two sites had

come to a standstill and that the sites were "off the table."  Although frustrated with the news,

Ernie nevertheless proceeded with his trip to Arizona.  While there, Ernie contacted a realtor who

was an acquaintance of Ernie's son.  After identifying some new kiosk locations, Ernie put the

realtor in contact with Mountain Mudd.  With the realtor's assistance, in July or August of 2004,

---

[4]  The Membership Agreement, which is signed only by Ernie, states it was entered into "this 20th day of February, 2003[.]" However, the parties agree the that the Membership Agreement was entered into in February of 2004.  Brenda also testified she signed the Membership Agreement, even though the copy introduced into evidence did not bear Brenda's signature.

Ernie identified two or three new business locations in Arizona.

In January 2005, Ernie negotiated leases for three alternative kiosk locations. One lease was ultimately not executed because an existing tenant would not agree to Ernie's business plan. Ernie, however, signed on January 24, 2005, an Espresso Kiosk Land Lease dated January 12, 2005, for a location at 2032 W. Guadalupe Road, Mesa, Arizona, and signed on May 4, 2005, an Espresso Kiosk Land Lease dated January 12, 2005, for a location at 1337 S. Gilbert Rd., Mesa, Arizona.[5] Ernie explained that he had to sign the lease agreements because Mountain Mudd could not move forward with the permitting process until it had specific physical addresses. After signing the leases, Dennis and Brenda assured Ernie that it would only take another 90 days or so to get Ernie's coffee kiosks up and running. Based upon the representations made by Dennis and Brenda, Ernie negotiated a clause in both leases that the leases would commence "the earlier of (a) the date Tenant initially opens for business to the public, or (b) the date which is ninety (90) days following the date of th[e] Lease." Ernie explained that he negotiated the 90 day delay in the leases so he would not have to pay rent until his coffee kiosks were ready to go.

Ernie believed that the permitting process was proceeding. That belief was bolstered when Brenda telephoned Ernie in September 2005 to advise him that his permits had been approved with stipulations and that his final payments were due. Ernie told Brenda and Dennis at that time that he would have to borrow funds to make his final payment, and he did not want to make the final payment unless everything was ready.

To satisfy the stipulations and secure the necessary permits, Brenda and Dennis assured Ernie all they had to do was modify the sinks in Ernie's kiosks, change the windows to 12 x 12

---

[5] The Espresso Kiosk Land Leases were Mountain Mudd's standard lease agreements.

windows and install hydraulic wheels.  Brenda and Dennis explained that the hydraulic wheels were a mere formality to satisfy the  permitting process and that Ernie could still service the kiosks with a van, as originally planned.  Brenda also assured Ernie that his kiosks would be ready in approximately 30 days.  Dennis confirmed during this same time that all he had left to do was put the hydraulic wheels on Ernie's kiosks.

To further assuage Ernie's concerns, Brenda agreed to make Ernie's loan payments until the kiosks were ready for installation.  Based upon Dennis and Brenda's statements and assurances made in September 2005, Ernie made his final payment to Mountain Mudd/Mountain Manufacturing.

Although more than 30 days passed after Ernie made his final payments on Kiosks #1 and #2 and even though Ernie still had not received his kiosks, Ernie attended Mountain Mudd's 2005 Christmas party and up until that time, continued to spend time at the Mountain Mudd headquarters, usually visiting with Dennis.  However, in early 2006, communications between Ernie, Dennis and Brenda dropped off significantly.  Ernie became more uneasy and testified that he felt he was getting the runaround.  Communications between Dennis, Brenda and Ernie essentially ceased when Ernie moved back to Arizona in June of 2006.  Ernie testified that once he moved to Arizona, he was "out of sight and out of mind" to Brenda, Dennis, Mountain Mudd and Mountain Manufacturing.

Ernie did not get his coffee kiosks and Mountain Mudd, Mountain Manufacturing, Brenda and Dennis have not refunded Ernie any of his money.  As a result of Ernie's earlier suit against Mountain Mudd, Mountain Manufacturing and Brenda before Judge Fagg and through this Adversary Proceeding, Ernie has learned that the permits for his kiosks were neither

13

approved nor imminent in September 2005 as he was led to believe by Brenda and Dennis.

Brenda explained at the trial that there are two aspects of the permitting process. First, an applicant must satisfy a city or county's zoning requirements and two, an applicant must comply with applicable health department codes. In certain instances, a state can override requirements imposed by a city or county. Brenda explained that she intended to override certain requirements imposed by the City of Mesa by obtaining a determination from the State of Arizona that Mountain Manufacturing's kiosks were factory built buildings as opposed to mobile units.

As mentioned earlier, Ernie signed three "Espresso Kiosk Land Leases" in January 2005. Those leases reflect property addresses of "NWC Country Club Drive and Southern Avenue, Mesa, Arizona 85210;" 1337 S. Gilbert Rd., Mesa, Arizona 85204;" and " "2032 W. Guadalupe Road, Mesa, Arizona 85202." A City of Mesa "Pre-submittal Conference Staff Report" prepared in connection with a March 14, 2005, conference identifies a location at 2051 W. Guadalupe. Although Ernie had not seen the report prior to this litigation, Ernie testified that 2051 W. Guadalupe and 2032 W. Guadalupe Road are the same property. The report establishes that Mountain Mudd had at least started the permitting process as of March 2005.

An email dated May 10, 2005, from Jackie Ludden ("Ludden"), National Sales Manager for Mountain Manufacturing, to "Dan" shows that as of May 10, 2005, Mountain Manufacturing was pursuing approval to operate a 8'x8' self contained unit. Ludden explains in her email that "we would like to remain self-contained, not hooking into city water and sewer servicing the kiosks with our service van which is equipped to replenish potable water to the building and remove the grey water from the building. . . . We will try to get a variance to operate this way in the city of Mesa." Similarly, Ronna M. Roll, Director of Permitting at Mountain Mudd, sent

14

Andy Linton of the Maricopa County Health Department, a letter dated May 16, 2005, advising that "Mr. Garcia has requested that I apply for a variance/waiver on the units returning to a commissary daily.  They propose that the Mobile Support Unit (MSU) operate from and return to the commissary daily while the mobile unit remains in place.  Mr. Garcia plans on utilizing 'Coffee Roaster of Phoenix' as his commissary."

Later, in an email addressed to Andy Linton, dated July 8, 2005, Ronna Roll wrote, in part: "I must warn you that because I had not heard back from you the owner of the company, Brenda Burkhartsmeier, requested that I submit a 2nd variance request.  This one is actually for a mobile unit (trailer) that has wheels."  Ronna Roll sent Andy Linton another email on August 15, 2005, advising that "[o]ur customer, Ernie Garcia, has decided to go with the 'mobile to a commissary' option.  He is in the process of having the commissary and restroom agreements signed."

Ernie testified that he was not a party to nor was he aware of the above-discussed correspondence.  Ernie also testified that nobody from Mountain Mudd, including Dennis and Brenda, had discussed the content of any of the emails with Ernie.

Ernie was similarly unaware of email communications taking place between May 24, 2005, and June 6, 2005, between Jackie M. Ludden, National Sales Manager of Mountain Manufacturing, Dan Demland of Phoenix, Arizona and Ronna Roll.  Dan Demland of Demland Design wrote to Jackie in an email dated June 2, 2005, that a restroom would most likely be required and that such requirement would "necessitate the use of running potable water and independent waste."

Shortly thereafter, in letters dated June 13 and 23, 2005, David Ludwig, Environmental

15

Health Division Manager for Maricopa County, advised Ronna M. Roll that her "request for a

variance that mobile food units report at least daily to a commissary or other fixed food service

establishment, . . . has been denied."  Ludwig explains in his June 13, 2005, letter:

> According to Chapter VIII, Section 3 of the Maricopa County Environmental
> Health Code, mobile food units are required to operate from a commissary or
> other fixed food service establishment and must report at least daily to such
> location for supplies, food storage, vehicle and equipment cleaning, waste
> disposal and service operations.  In addition, the code requires that all mobile food
> establishments remain vehicle mounted and readily movable.
>
> As indicated in your proposal, the drive-thru coffee kiosks themselves
> would not be movable and would therefore be incapable for meeting either of
> these requirements.  As an alternative, it may be possible for the kiosks to qualify
> and obtain a permit for a fixed food establishment, such as an Eating & Drinking
> permit.  The units would be required to have approved, permanent plumbing
> connections (to both water and sewer) and would have to meet all other
> requirements for fixed food establishments as described in the Maricopa County
> Environment Health Code.

Finally, on September 6, 2005, Vonda J. Canaan, an Environmental Health Specialist

with the Mobile Food Program of the Environmental Health Division in  Maricopa County,

Arizona sent a Notification of Plan Approval addressed to Ernie at 2120 3rd Avenue N, Billings,

MT, which was Mountain Mudd's corporate address.  Brenda received the letter and testified that

the Notice advises that Mountain Mudd's request for a mobile kiosk permit was "approved" with

stipulations.  The letter identifies 37 general requirements for mobile food units and also

identifies three specific items that had to "be addressed on plan and/or permit application . . .

prior to inspection and permit approval."  The letter recites: "Plans indicate the grey water will be

disposed of from another vehicle.  This is not acceptable by Maricopa County Environmental

Health Code standards.  The unit must be moved on a daily operational basis to a commissary for

grey water disposal, cleaning and potable water fill."

16

Upon receipt of the September 6, 2005, Notification, Brenda advised Ernie that his permits had either been secured, or were imminent and that his final payments were due.  Exhibit 10 is a copy of an invoice dated September 27, 2005, addressed to Ernie Garcia, at 3025 Gloxina, Billings, MT 59102, identifying Ernie's two Model 88 kiosks at a price of $73,500.00 each.  The invoice was never sent to Ernie.  Exhibit 11 is a statement dated September 28, 2005, from Mountain Manufacturing, Inc. to Ernie Garcia at 3025 Gloxima, Billings, MT 59102, showing a balance of $147,000 stemming from Invoice No. 1413.  The statement shows a payment of $73,500 made September 27, 2005, and a payment of $55,000 made September 28, 2005.  Per the Statement, Ernie had a balance owing of $18,500.  Ernie did not receive the statement.  The purpose of the invoice and statement is not clear.  What is clear is that Mountain Manufacturing was preparing inaccurate invoices and statements because the undisputed evidence shows Ernie made a payment of $73,500.00 in February or March of 2004, which payment is not reflected on the September 27, 2005, invoice or statement.

After Ernie made his final payment, a City of Mesa "Pre-submittal Conference Staff Report" prepared in connection with an October 17, 2005, conference states that the "proposed use, a mobile food facility (Mountain Mudd Espresso), is regarded as a 'Transient Merchant' business in the City of Mesa."  The Staff Report also states that the property at 2051 W. Guadalupe was zoned C-2 and that "[t]he allowed zoning districts for Transient Merchant businesses are M-1, M-2, or TCB-2 with a Special Use Permit."

In response to the above Staff Report, Brenda sent a letter to Gordon Sheffield, Zoning Administrator, asking for a definition of "transient merchant."  Brenda argues in the letter dated October 18, 2005, that "Garcia Coffee is a drive-through restaurant/facility" and that "Mountain

17

Mudd Espresso is strictly a drive-through restaurant that 'provides food or beverage service directly to patrons within parked vehicles for consumption on or off the premises'."  Brenda testified at trial that she did not think the kiosks she sold were transient because they could be hooked to city sewer and water.

In response, Gordon Sheffield sent Brenda a letter on October 19, 2005, stating "[t]he mobile unit with which you intend to dispense coffee through drive-up windows is defined as a vehicle, based on Maricopa County Health Code definitions for 'Mobile Food Service' and 'Mobile Food Unit'[.]"  Gordon Sheffield also writes in the letter:

> Because your described use is conducted from a vehicle, and constitutes an outdoor activity, it is interpreted to be an outdoor land use, and therefore not permitted within either the O-S, C-1 and C-2 zoning districts.  In addition, it is not a permitted land use in the C-3 zoning district because it is not one of the outdoor land uses listed in Sec 11-6-2(D).

> If you want to conduct a coffee dispensing business from a drive-up window, the business is welcome at either of the two sites you have proposed if it is conducted from within an enclosed building.  Provisions for constructing such a building at either site are possible, provided the appropriate site plan amendments are approved; the Mesa Design Review Board approves your building designs; and construction permits are issued for both projects, respectively.

> If you disagree with this interpretation of your activity as it relates to the Mesa Zoning Ordinance, you may file an application to appeal it to the Mesa Board of Adjustment, which has the authority to reverse, affirm or modify this decision.

Brenda did not appeal the zoning decision to the Mesa Board of Adjustment because according to Brenda, she was seeking approval of a factory built building with an insignia from the State of Arizona.  Brenda explained that her kiosks are factory built buildings and that an insignia from the State of Arizona would override the City of Mesa's conclusion that Brenda's kiosks were vehicles.  Mountain Mudd and Mountain Manufacturing did not advise Ernie of the Pre-

submittal Conference Staff Report prepared in connection with a October 17, 2005, conference or Brenda's correspondence with Gordon Sheffield.

Permits for Ernie's locations in Arizona were never secured.  The first written communication Ernie received from Mountain Mudd after approximately the fall of 2005, was the November 17, 2006, letter Brenda sent to "Co-op Member[s]" announcing that Mountain Mudd, Mountain Manufacturing and Coffee Cooperative had joined forces with CHS, Inc.

At some point, Ernie advised Mountain Mudd that he wanted a refund of his final payment until his kiosks were ready.  In a letter dated January 18, 2007, Brenda wrote:

> "[W]e have agreed to temporarily return $70,000.00.  This will reduce your down-payment to approximately 50% until such time that the City of Mesa makes an approval or denial of our request to utilize two (2) mobile kiosks instead of two (2) stationary kiosks.  As you are aware, stationary kiosks are presently approved contingent on the installation of city services.
>
> Upon return of the monies Mountain Manufacturing will immediately discontinue to pay rent on the two (2) leases and the monthly loan payment at First Interstate Bank.

In response, Ernie sent Brenda an email on January 22, 2007, which reads: "It sounds like the 'kiosk' is 'approved' with sewer and water hookups! not with it's present form as we know that kiosk self contained with no modifications?"  In another email, also sent January 22, 2007, Ernie inquired:

> 1.  Why are we trying to get mobile kiosk instead of standard on the ground kiosk"
>     (have we been denied on the standard ground kiosk?)
> 2.  How can we have "any" approval when these have yet to go before any public hearing from planning and zoning commission.

Brenda, Dennis and Mountain Mudd did not refund Ernie his $70,000 as Brenda agreed to do in her letter of January 18, 2007.  Instead, Brenda sent Ernie another letter dated January

30, 2007, setting forth six options for Ernie to consider.

In early 2007, Ernie began making his own inquiries in Arizona.  In response to an inquiry from Ernie, Gordon Sheffield sent Ernie a letter dated February 13, 2007, writing:

> The kiosk, as I understand it, was to be housed within a portable trailer, of sorts, that was to be towed to the designated site each day.  At the end of the business day, the trailer was to be removed from its on-site anchor, and returned to a "cafeteria" for cleaning, basic maintenance and restocking of supplies.  The trailer would then be returned to the site the next morning, re-attached to its anchoring system, and prepared for daily business operations. It was also my understanding that the trailer would be without bathroom facilities, and would be dependent upon another suite or tenant space within the commercial center for provision of bathroom facilities.

> A representative of Mountain Mudd initially contacted me about this project approximately a year ago.  My response was to inform them of the requirements of Sec 11-6-2 if the Mesa Zoning Ordinance.  This section states that in the C-2 district, all activities are required to be conducted "entirely within an enclosed building, with no outside storage or display."  Food service uses, and in particular restaurants, are permitted in the C-2 district.  Restaurants with outdoor seating and drive-through lanes are also allowed . . .   However, a trailer is not permitted as a means to house and conduct business, because a trailer is not an "enclosed building."  As that term is understood for zoning purposes, an enclosed building is permanently attached to a foundation.  Other requirements of the Mesa City Code, including the Mesa Building Code are also applicable, and include requirements for individual occupancies to have water and bathroom sanitary facilities attached though the use of permanent fixtures to the City of Mesa utility system.

> I explained that Mountain Mudd would have to demonstrate that a "building" (and not a trailer) could be removed from a foundation, transported regularly to its commissary or "base station," and then returned and successfully attached to its on-site "foundation" on a daily basis.  Other requirements, such as inspections and permits relating to other Mesa City Code provisions would also be applicable.  This latter requirement would also involve attaching the water and sewer hook-ups to the City's utility system.

> I have heard that progress towards this goal has been attempted, but I have not seen anything yet that I believe would specifically satisfy the requirement of operating this food service business from an enclosed building.  The last conversation I have had with someone representing this project was probably last fall, when I repeated my request for additional information showing how a

Mountain Mudd kiosk would meet the enclosed building requirement, and other Mesa City Code provisions, for a food service use in the C-2 district.

Therefore, the current status of the project is this: Dispensing coffee and other food products through a drive-through window of an anchored but portable trailer is not considered a permitted use in the C-2 zoning district, and it would not be permitted to operate on or from any commercial center located in an C-2, Limited Commercial zoning district.

On February 20, 2007, Ernie sent Brenda a letter asking that Brenda "'please' refund my initial investment of $147,000 so we can end this." Brenda responded to Ernie later that date writing:

[T]he letter on the 19th was denied as a mobile kiosk, in paragraph 7 of that same letter states a building would be approved, we then proposed an FBB which is a Factory Built Building, at that point the city of Mesa does not have jurisdiction. It is then in the states jurisdiction and then only site issues are addressed by the City of Mesa Development Services Building Safety Division which the senior plans examiner only asks for the electrical schematics with an engineers seal.

That is what is approved, not a mobile kiosk as in our first application but an FBB. Your kiosks are built to the standards of an FBB.

* * *

We have your kiosks and you can have them or a partial refund plus a lease or resale of kiosk or combination of several scenarios which I've detailed.

Ernie responded on February 21, 2007, that he had "a 'new' letter from Mr Scheffield dated Feb 13 2007 denying the kiosk use on both locations, he will allow a 'building' to be 'constructed' on site with sewer and water hookups and a bathroom installed....this is not the self contained kiosk which I invested in....I don't care about the leases anymore I have a letter denying the 'kiosk' use..." Brenda responded:

A FBB - factory built building has the approval and is indeed an enclosed building, This does not have to be site built that is the very definition. That is the approval we have been working on since Gordon stated we would need that

21

requirement because he could not approve the kiosk without that certification. Why would i build them if they were not built to the FBB standards which was an additional 15,000 dollar expense that we absorbed to meet the requirement.  We have followed through on all the requirements called out by all the governing agencies.

I have the letter stating the exemption for the bathroom, this is per IBC code 2902.4[6] I do not know how to exit this gracefully when we have built your kiosks, paid all your payments and have even offered to resell the kiosks, your kiosks are built to FBB standards.  That is exactly what i have been saying all along.

By having the approval of a FBB we can also not hard plumb the units.  I'll happily send you documentation just give me a fax number, We only had to hard plumb if we were using a kiosk with no FBB certification.  The IBC code 2902.4 however is an exemption for the restroom in both applications.  Never has a restroom been in dispute.

I keep telling you a kiosk that is self contained is not approved you are correct.  A FBB is governed by the state of AZ not Mesa other than site utility plans.  (electrical)

By early February of 2007, Ernie had returned to Montana.  On or about February 18 or 19, 2007, Ernie told Brenda that he would take his kiosks and operate them in Billings.  Brenda responded that such proposal was not acceptable to Mountain Mudd's new owners.

Brenda testified Ernie's kiosks were perhaps completed within a month or so after Ernie's second payment.  Defendants have no proof, other than their word, that Ernie's coffee kiosks were indeed built.  Brenda maintains that Ernie refused to take delivery of his kiosks in October, November and December of 2006 and January of 2007.

In 2007, Ernie commenced a state court action against Mountain Manufacturing, Inc., Mountain Mudd, LLC, The Coffee Cooperative, Inc., ABC Coffee, LLC, Brenda Burkhartsmeier and Dennis Burkhartsmeier.  Ernie received a final judgment against Mountain Manufacturing,

---

[6]  The Defendants did not offer any evidence showing they had an exemption from the requirement that Ernie's coffee kiosks have bathrooms.

Mountain Mudd, The Coffee Cooperative, ABC Coffee and Brenda in April of 2011.

In addition to the foregoing facts, the parties agree that Mountain Manufacturing advanced approximately $719,000 to the Defendants so Defendants could build their cabin near Cooke City, Montana.  The parties similarly agree that on May 5, 2005, Daniel Mastin, Senior Building Plans Examiner, City of Mesa Development Services Building Safety Division, sent an Email to Ronna Roll at Manufacturing explaining that Ernie's kiosks must be connected to the city's potable water distribution system and the sanitary sewer system.  Daniel Mastin also informed Ronna Roll that Maricopa County Environmental Services had review authority as well.  Ronna Roll responded via email on May 10, 2005, explaining that Mountain Mudd's kiosks were not designed to connect to city water or sewer, but rather, that a service van replenishes potable water and removes grey water.  *See* Pre-Trial Order, docket entry no. 35, ¶ 16, p.3.

The parties further agree in their Pre-Trial Order that on June 2, 2005, Dan Demland sent an Email to Jackie Luden, of Manufacturing, that the plans for Ernie's Kiosks must be redesigned. Demland informed Jackie Luden that, under Arizona law, the kiosks must be redesigned to meet ADA requirements, including a restroom, running potable water, and independent waste.  On June 13 and 23, 2005, David Ludwig of Maricopa County Environmental Health Division Manager, sent Ronna Roll a letter denying the commissary variance request for the kiosks.  David Ludwig stated that the kiosks would not qualify for the commissary waiver because the kiosks would not return to a commissary on a daily basis.

On July 7, 2005, Andrew Linton, Maricopa County Environmental Services—Mobile Food Program Manager, sent an Email to Ronna Roll reiterating that the commissary variance

23

had been denied and the only options would be to have the kiosks report to a commissary daily or connect permanently to city sewer and water.  In August 2005, Mountain Manufacturing resubmitted the request for the commissary permit for both kiosks stating that the kiosks would return to the commissary daily.

On November 23, 2006, the Defendants made a payment of $72,400 out of Mountain Manufacturing to Louise Burkhartsmeier, Brenda's sister-in-law.  In addition, Seaside received $1,636,120.00 in net proceeds from the Asset Purchase Agreement.  In 2008, the Defendants caused their 2006 tax returns and the 2006 tax returns for the Mountain Mudd Entities to be amended to reallocate proceeds from the Asset Purchase Agreement among the Mountain Mudd Entities resulting in a $150,000.00 reduction in taxes owed.  Specifically, they reallocated an additional $781,351.00 in gross proceeds from the Asset Purchase Agreement to Mountain Manufacturing.

APPLICABLE LAW

Ernie filed his Amended Complaint in this Adversary Proceeding on March 20, 2012, seeking to except $194,322.06 from Debtors' discharge under 11 U.S.C. § 523(a)(2).  Section 523(a)(2)(A) provides that, "a discharge under . . . this title does not discharge an individual debtor from any debt – (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by – (A) false pretenses, a false representation, or actual fraud, . . . ."  To prevail on a § 523(a)(2)(A) claim, a creditor must establish five elements: "'(1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor

24

proximately caused by its reliance on the debtor's statement or conduct.'" *Oney v. Weinberg (In re Weinberg)*, 410 B.R. 19, 35 (9th Cir. BAP 2009) (quoting *Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman)*, 234 F.3d 1081, 1085 (9th Cir. 2000)).  *See also Harmon v. Kobrin (In re Harmon)*, 250 F.3d 1240, 1246 (9th Cir. 2001*); American Express Travel Related Services Co. Inc. v. Hashemi (In re Hashemi),* 104 F.3d 1122, 1125 (9th Cir.1996); *Apte v. Japra, M.D., F.A.C.C., Inc. (In re Apte)*, 96 F.3d 1319, 1322 (9th Cir. 1996).  Consistent with effectuating the underlying purposes of the Bankruptcy Code, exceptions to discharge under §§ 523 are to be narrowly construed.  *See Snoke v. Riso (In re Riso)*, 978 F.2d 1151, 1154 (9th Cir. 1992).  Notwithstanding the weighty burden, a creditor bears the burden of proof to establish each of the five elements by a preponderance of the evidence.  *In re Slyman*, 234 F.3d at 1085.

The Ninth Circuit has concluded that the nondisclosure of material information in the context of a business transaction will support an exception to discharge claim under § 523(a)(2)(A), analogizing such a situation to securities fraud.  *See In re Apte*, 96 F.3d at 1323 ("the nondisclosure of a material fact in the face of a duty to disclose [establishes] the requisite reliance and causation for actual fraud under the Bankruptcy Code.")

The determination of nondischargeability under § 523(a)(2)(A) is a question of federal, not state law and since the elements of § 523(a)(2)(A) mirror the common law elements of fraud, courts must interpret these elements consistent with the common law definition of "actual fraud" as set forth in the Restatement (Second) of Torts (1976) §§ 525-557A.  *Field v. Mans*, 516 U.S. 59, 69, 116 S.Ct. 437, 443-44, 133 L.Ed.2d 351 (1995) ("'false pretenses, a false representation, or actual fraud,'. . . are common-law terms, and...in the case of 'actual fraud,'...they imply elements that the common law has defined them to include.").

25

The first three elements of § 523(a)(2)(A), when taken together, establish the element of intent to deceive, which the creditor must establish by a preponderance of the evidence. In other words, a creditor must establish that a debtor knowingly made a false representation, either express or implied, with the intent of deceiving the creditor. In a two-party transaction, as distinguished from a three-party credit card transaction, the alleging party must prove the elements of misrepresentation and reliance directly and by a preponderance of the evidence and not by reference to the totality of the circumstances. *Compare In re Slyman*, 234 F.3d at 1086, *with Citibank (South Dakota), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1086 (9th Cir. 1996).

As to the remaining elements, a creditor sustains its burden of proof under § 523(a)(2)(A), if a Court, after considering the facts and circumstances of a particular case, answers the following two inquiries in the affirmative: 1) did the creditor justifiably rely on the debtor's representation–reliance; and 2) was the debt sought to be discharged proximately caused by the first two elements–causation.

A creditor must establish that it relied on the false representations made by the debtor. *Field*, 116 S.Ct at 438 (1995). Such reliance need not be reasonable, but it must be justifiable. *Id*. As the Supreme Court held in *Field*, "a person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Id*. at 444 (quoting § 540 Restatement (Second) of Torts (1976)). This standard depends upon the knowledge and experience of the person to whom the representations were made. As the Supreme Court in *Field* further explained:

> [A] person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. Thus, if

26

> one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses. Thus, a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses."

*Id*. (quoting § 541, Comment a., RESTATEMENT (SECOND) OF TORTS (1976)). Interpreting this standard, the Ninth Circuit Court of Appeals teaches: "Although one cannot close his eyes and blindly rely, mere negligence in failing to discover an intentional misrepresentation is no defense for fraud." *Apte*, 96 F.3d at 1322.

Finally, to prevail under 11 U.S.C. § 523(a)(2)(A), a creditor must establish that a claim sought to be discharged arose from an injury proximately resulting from his or her reliance on a representation that was made with the intent to deceive. *Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir. 1991). "Proximate cause is sometimes said to depend on whether the conduct has been so significant and important a cause that the defendant should be legally responsible." *Id*. at 604. Moreover, as the United States Supreme Court explained in *Field*, a court may turn to the Restatement (Second) of Torts (1976), "the most widely accepted distillation of the common law of torts" for guidance on this issue. *Field*, 116 S.Ct. at 443.

The RESTATEMENT (SECOND) OF TORTS (1976) explains that proximate cause entails (1) causation in fact, which requires a defendant's misrepresentations to be a "substantial factor in determining the course of conduct that results in loss, § 546; and (2) legal causation, which requires a creditor's loss to "reasonably be expected to result from the reliance." § 548A. *See also In re Creta*, 271 B.R. 214, 220 (1st Cir. BAP 2002). In determining the presence of

proximate cause, however, courts must refrain from relying on speculation to determine whether and to what extent a creditor would have suffered a loss absent fraud. *Siriani v. Northwestern Nat'l Ins. Co. of Milwaukee, Wisc. (In re Siriani),* 967 F.2d 302, 306 (9th Cir. 1992).

DISCUSSION

This case is governed by two relevant dates: the date Ernie made the first payment of $73,500.00 on or about February 20, 2004; and the date Ernie made his second payment of $73,500.00 in September 2005. Ernie has not shown that either Brenda or Dennis made a verbal or written representation to Ernie that was false in February 2004. However, the Court finds that Brenda and Dennis failed to disclose material information regarding the permitting process to Ernie in September 2005 and Brenda's statement that the permits had been secured or were imminent, was plainly false.

The record shows no permits were secured on behalf of Ernie. While Mountain Mudd arguably had approval, subject to stipulations, to secure permits to operate Ernie's kiosks from the Maricopa County health department, nothing in the record shows Mountain Mudd had the necessary zoning permits. In fact, it appears the requirements Mountain Mudd had to satisfy to obtain the necessary permits from the health department were at odds with the requirements Mountain Mudd needed to satisfy to obtain the necessary zoning permits. For example, one of the stipulations for health department approval was that Ernie's kiosks be moved to a commissary on a daily basis. However, the zoning department wanted Ernie's kiosks to have restrooms and be connected to city sewer and water. Brenda wrote Ernie in February 2007 that she had an exemption for the bathroom, but the letter was not introduced into evidence.

Brenda also testified that hooking to city water and sewer was easy because all kiosks

28

were built to be hooked up to city sewer and water.  According to Brenda, all Ernie had to do was agree to connect his kiosks to city sewer and water.  Brenda's testimony is at odds with Ronna Roll's May 5, 2005, email to Daniel Mastin claiming that Mountain Manufacturing's kiosks "are designed *not* to connect to city water or sewer." (Emphasis added).  In addition, as of September 6, 2005, Mountain Manufacturing was seeking to obtain approval of a mobile kiosk permit.  Although Mountain Manufacturing had secured, with stipulations, a mobile kiosk permit from the health department, correspondence with Gordon Sheffield in October 2005 reveals that the zoning at the selected sites would not permit transient merchants.  Moreover, in a letter dated January 18, 2007, Brenda was telling Ernie that she was seeking approval to utilize two mobile kiosks.  In sum, the Court finds that Mountain Mudd never secured the necessary permits on behalf of Ernie and its attempts to secure permits on behalf of Ernie in Mesa were, in all likelihood, doomed to failure.  Thus, the representation made to Ernie in September 2005 that permits were secured or imminent was simply false.

The representation that Mountain Mudd had secured or was certain to secure the necessary permits for Ernie's kiosks in Arizona was material and Brenda knew at the time she made the representation that it was false.  Furthermore, Brenda made the false statement and representation to induce Ernie into making the final installment payment, which was not due until Mountain Mudd had secured the necessary permits.  Ernie would not have made the final installment payment had he known the permits were still pending.  Ernie, who was not involved in the permitting process, reasonably relied upon Brenda's false statements and as a result, Ernie was proximately damaged.  Ernie was similarly damaged by Dennis' failure to disclose the knowledge and information he had to the contrary.

29

For the reasons discussed above, the Court finds that Ernie is entitled to judgment under 11 U.S.C. § 523(a)(2)(A).  In April of 2011, Judge Fagg entered judgment in favor of Ernie in the amount of $194,322.06.  That judgment stems from Ernie's down payment of $73,500.00 made in February 2004 and his final payment of $73,500.00 made in September 2005.  Because the judgment stems from two equal payments, the Court finds it appropriate, in this Adversary Proceeding, to enter judgment in favor of Ernie for one-half the amount of Judge Fagg's judgment, or $97,161.03, which corresponds to the damages associated with the failure of disclosure by Brenda and Dennis and the fraudulent statements made by Brenda which induced Ernie to make the second payment in September 2005.  In accordance with this Memorandum of Decision,

IT IS ORDERED that a separate judgment shall be entered in favor of Plaintiff Ernie Garcia and against the Debtor/Defendants, Brenda Burkhartsmeier and Dennis Burkhartsmeier; and the sum of $97,161.03 is excepted from Debtors' discharge under 11 U.S.C. § 523(a)(2)(A).

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

30